# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MARIAN LORETTA TURNER,           )
                                 )
        Plaintiff,             )
                                 )
                      Case No. 14-CV-671-JED-JFJ
v.                               )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
        Defendant.             )

## OPINION AND ORDER

The plaintiff, Marian Loretta Turner, initiated this action under the Federal Tort Claims Act (FTCA), alleging that the Claremore Indian Hospital (the Hospital) and its staff were negligent in the medical care they provided to the plaintiff. Ms. Turner seeks money damages for injuries she alleges were caused by substandard care at the Hospital between October and December, 2012. The Court conducted a bench trial and received the in-court testimony of thirteen witnesses: Glenn Ault, M.D., Robert Skib, M.D., the plaintiff Marian Turner, Nina C. Jones, M.D., Hooby Yoon, D.O., Craig Johnson, M.D., Steven Brown, R.N., Jack Mocnik, Jr., M.D., Cindy O'Mary, R.N., Linda Edens, R.N., Edwina Rae Berryhill, R.N., Cheri Fleming, R.N., and Danna Roberts, R.N. The Court also admitted and considered the deposition testimony of Juni Femi-Pearse, M.D. and Nathan Powell, M.D. The Court admitted into evidence Plaintiff's Exhibits (PX) 1 through 46, 49 through 51, and 54 through 60, and Defendant's Exhibits (DX) 1 through 5, 7 through 14, 16 through 20, 22 through 49, and 51 through 59.

Pursuant to Fed. R. Civ. P. 52(a), and upon consideration of the evidence admitted at trial, including the demeanor and credibility of the witnesses, the Court makes the following findings of fact, by a preponderance of the evidence, and enters the following conclusions of law.

## I. Findings of Fact

### *Jurisdiction and Administrative Exhaustion*

Ms. Turner sues the defendant for negligence in connection with the care and treatment she received at the Hospital from October 15, 2012 through December 9, 2012. She timely presented notice of her tort claim to the United States, and the claim was subsequently deemed denied. Specifically, on or about April 15, 2014, the Department of Health and Human Services received Ms. Turner's Form 95 and Notice of Claim for $2,200,000 in damages. She timely and properly presented her claim under the FTCA and, due to the passage of six months, the claim was deemed denied. She then timely filed her Complaint after fully exhausting her administrative remedies. (*See* Doc. 2 at ¶¶ 5-8 and Exhibit A; Doc. 19 [admitting ¶¶ 5-8 of Doc. 2]).

### *Medical Negligence*

Ms. Turner was admitted to the Hospital on October 15, 2012 and was diagnosed with diverticulitis. (Doc. 80, at ¶ III.1). On October 23, 2012, Dr. Femi-Pearse performed a colostomy on Ms. Turner at the Hospital to treat her diverticulitis. (*Id.* at ¶ III.2).[1] In connection with the surgery, a large midline incision was made from above her umbilicus, around the umbilicus, and down to the groin area. (*See* PX 27). Ms. Turner was informed that the colostomy would be needed for approximately three to six months after surgery. (Transcript, Doc. 87 at 215). She was still in pain and sick upon discharge from the Hospital on October 29, 2012. (*Id.* at 218). On November 5, 2012, Ms. Turner returned to the Hospital due to vomiting, changes to her stoma, "intense abdominal pain along the incision site," and "white stuff" draining from the incision. (*See* PX 11, 13; Doc. 87 at 218-219). Ms. Turner testified that, between her discharge on October 29

---

[1] Dr. Femi-Pearse was an employee of the United States of America. The Attorney General's designee previously certified that Dr. Femi-Pearse was acting within the scope of employment at the time of the medical care at issue in this suit. (*See* Doc. 24).

and her return to the Hospital on November 5, the stoma had changed and "was getting oblong and going flat against [her] stomach," whereas it had been like a raised "little red ball" right after surgery. (Doc. 87 at 219).

When Ms. Turner returned to the Hospital on November 5, the midline incision was described as having drainage from two sites, one was "infra umbilical," or below the umbilicus, and the other was "supra umbilical," or above the umbilicus. (*See* PX 11; *see also* Doc. 86 at 62). The progress note entered by Dr. Femi-Pearse for the November 5 examination recorded "dark grumous fluid" in the infra umbilical part of the incision, and "cheesy liquid" in the supra umbilical section. (PX 11). The wound was packed with 5 yards of gauze. (*Id.*). A CT scan was taken and reviewed, and cultures were taken from the midline wound and sent to the lab for review. The radiologist recorded observing multiple small pockets of subcutaneous air along the incision site and indicated a differential diagnosis of "residual postoperative air versus cellulitis, and less likely abscess." (PX 13). At the conclusion of the November 5 Hospital visit, Ms. Turner was directed to return to the Hospital in one week.

On November 10, 2012, Ms. Turner returned to the Hospital, reporting to the emergency room. The reports from the cultures taken on November 5 were reviewed, and the results were discussed. (PX 14). The cultures indicated the presence of bacteria, including "abundant Escherichia Coli" (E. Coli), "abundant Enterococcus Faecalis," and some staphylococcus bacteria. (*See* PX 12). Enterococcus Faecalis is a bacteria that is very specific to the colon, and E. Coli is a bacteria commonly found in the bowel. (Doc. 86 at 55). When the Faecalis bacteria is found outside of the colon, it is cause for medical concern. (*Id.* at 55-56). However, no further medical treatment was recommended. (PX 14). Ms. Turner was sent home, with directions to return for her next scheduled visit. (*Id.*).

On November 14, 2012, Ms. Turner returned to the Hospital. She continued to complain of pain and difficulty fitting the colostomy bag. Dr. Femi-Pearse's medical progress note reflected that the shape of the stoma had changed and was "more oblong than oval." (PX 15). The midline wound was "crusted over," "pus [was] evacuated," and the wound was cleaned and packed with gauze. (*Id.*). However, Dr. Femi-Pearse recorded that the "colostomy [was] functional and without necrosis." (*Id.*). He told Ms. Turner that everything was "fine," gave her more pain medication, and instructed her to return in six weeks. (Doc. 87 at 222). A nurse assisted Ms. Turner in attaching the colostomy bag, attended to the incision wound, and gave Ms. Turner a prescription to take to the pharmacy. (*Id.*). As Ms. Turner was walking toward the pharmacy area, the bag came loose and leaked onto the front of her body and clothing. (*Id.*). With the assistance of her boyfriend (now-husband), Scott Fitch, Ms. Turner made it to a restroom, where she sat while Mr. Fitch went to get nursing assistance. (*Id.*). As Ms. Turner sat in the restroom, "pus was just running out [from the midline incision] just like you turned on a faucet." (*Id.*).

Ms. Turner returned to the Hospital on November 15, 2012, because she was continuing to have problems with nausea and vomiting, and there was little output into her colostomy bag. (*Id.* at 224-225). Ms. Turner was having difficulty keeping her medications down. (*Id.* at 225). Pus was still observable in the midline wound, except that the color of the pus had changed more to a brown-looking color. (*Id.*). The ostomy was flatter and less raised than before. (*Id.*). Dr. Femi-Pearse prescribed antibiotics and fluids, and directed Ms. Turner to "eat more protein, walk, and get off the pain medication." (*Id.* at 226). Unfortunately, Ms. Turner continued to have "stabbing pain." (*Id.* at 226-227). She felt sharp pain and burning on the skin around her stoma, and she reported her pain level to be very high. (*Id.* at 227-228).

The history and physical for the November 15, 2012 Hospital admission reflected that Ms. Turner reported with "abd[ominal] pain, Extreme Difficulty fitting Colostomy bag resulting in fecal leakage unto [sic] the Skin and into her Incision, [and] Drainage from abdominal Wound." (PX 16). The colostomy was described as a "slit like LLQ [lower left quadrant] colostomy with Liquid Brown Stool," and the record reflects that the supra umbilical area of the incision was draining pus, while the lower area was draining dark brown liquid. (PX 16). An assessment performed by Cindy O'Mary, R.N. on November 15 indicated that, when dressings were changed, approximately 45 cc's of pus with a foul odor was expressed from the upper wound. (PX 42 at CIH 249). In addition, Nurse O'Mary noted that the ostomy was leaking and, when the bag was changed, "drainage from [the] stoma looks like pus that was expressed from upper wound." (*Id.*).

On November 16, 2012, another CT scan was performed for a questionable abscess. The CT report reflected that there was an open wound with packing material and scattered stranding and subcutaneous air throughout the anterior abdominal wall. (PX 17). Wound cultures were once again taken on November 19, 2012, with results completed on November 23, 2012. The cultures once again reflected abundant Enterococcus Faecalis. (PX 21).

Ms. Turner remained in the Hospital from November 15 to December 4, 2012. Throughout those weeks, Hospital records reflect that she was frequently in pain, nauseous, vomiting, and constipated. Her stoma was described as slit-like, oblong, flat, flush and constantly leaking, causing contamination of her midline incision site with feces. Laboratory reports consistently reflected that Enterococcus Faecalis bacteria contaminated her midline wound, and Ms. Turner had elevated white blood cell counts with intermittent fever. On November 21, a wound vacuum system (wound vac) was applied to the midline wound site, and drainage collected in the wound vac canister was brown, tan, blood-tinged, and foul smelling. (PX 42 at CIH 236-440; *see, e.g.,*

*id.* at CIH 249, 258, 271, 273, 274, 275-276, 279, 289, 290, 294, 297, 302-303, 311-312, 319, 322, 329, 337-338, 341, 399, 345, 347, 362, 367, and 369).

On November 25, 2012, Dr. John Lang, another physician at the Hospital, examined Ms. Turner and made treatment recommendations. Dr. Lang suspected an "enterocutaneous fistula," which he did not mention to Ms. Turner but which he would discuss with Dr. Femi-Pearse. (PX 42 at CIH 311-312). Dr. Lang recommended that a repeat CT be considered "to evaluate for etiology of increasing [white blood cell count], also for [the] presence of a fistula." (*Id.* at CIH 313). He deferred further management of the patient to Dr. Femi-Pearse. (*Id.* at CIH 314). Despite Dr. Lang's impression and recommendation, the Hospital performed no further CT scans to evaluate the etiology of Ms. Turner's increasing white blood cell counts. On November 26, Dr. Femi-Pearse performed a fistulagram through the upper abdominal wound only. No barium or dye was injected into the ostomy to determine if it was leaking or communicating pus, fluid or fecal material through a tunnel beneath the skin or through a subcutaneous fistula. (*See* PX 26).

Throughout her November 15 to December 4 Hospital stay, Ms. Turner continued to have multiple problems keeping the colostomy bag attached and leak-free, even with the assistance of nursing staff at the Hospital. (Doc. 87 at 231). Dr. Femi-Pearse discharged her on December 4, 2012, although she was still nauseous and vomiting. (*Id.* at 231-232). On the date of her release, a nurse, Alisa Cruce, recorded that Ms. Turner reported discomfort in her abdomen above the wound vac dressing and that Ms. Turner stated, "it feels like something is stuck there." (PX 42 at CIH 367-368). Ms. Turner was released with instructions to return in 6 weeks. (PX 22).

Ms. Turner returned to the Hospital on December 8, 2012 with complaints of pain in and around her stoma, vomiting, persistent nausea, and chills. (PX 23). She was diagnosed with a genital yeast infection. Abdominal pain, nausea, vomiting, and wound infection were noted, and

Dr. Femi-Pearse recorded that a formal operative exploration and drainage of the supra umbilical wound might be required. Ms. Turner was discharged on December 9 and instructed to return for her next scheduled appointment – more than five weeks away. (PX 23 and 24).

On December 12, 2012, Ms. Turner reported to the emergency room at Saint Francis Hospital in Tulsa (Saint Francis) with abdominal pain. She was admitted and finally diagnosed with a retracted stoma and packing material in her abdominal incision. (Doc. 80 at ¶ III.4). Upon examination in the emergency room, Debra VanZandt, M.D. noted in Ms. Turner's history that she had a wound that was progressively worsening and that she had been in pain around the wound and colostomy site since placement. Based on Ms. Turner's symptoms, examination, and radiologic findings, Dr. VanZandt was concerned about potential "retraction of her ostomy back into her abdomen" and "a large, infected abdominal wound, with possible foreign body within the wound on CT." (PX 30 at 6). Ms. Turner was referred to Dr. Nathan Powell for exploratory surgery with possible revision or takedown of the colostomy. (*Id.*).

On December 13, 2012, Dr. Powell performed an exploratory surgery on Ms. Turner at Saint Francis. After entering the open wound and dissecting through subcutaneous tissue, Dr. Powell found a foreign body embedded in purulent drainage and a scar from previous packing of the wound. Dr. Powell then turned his attention to the previous ostomy site and found a colostomy that was retracted down to the level of the fascia. He also encountered a fistula tract and significant intra-abdominal adhesions from the previous surgery. Dr. Powell took down the old colostomy and formed a loop ileostomy on the opposite side of Ms. Turner's lower abdomen. (PX 5).

In his testimony, Dr. Powell explained that Ms. Turner's stoma had retracted down to the level of the fascia, just above the muscles, which he estimated to be 10 to 15 centimeters below the level of the skin. (PX 56 at Dep. p. 11). It was Dr. Powell's opinion that Ms. Turner required

emergent surgery. (*Id.* at 23). He further explained that the retracted stoma resulted in a dysfunctional colostomy, because bowel contents would not completely empty into the colostomy bag, but instead were "tunneling through her abdominal wall as well as across the abdominal wall into the middle wound or midline wound." (*Id.* at 5-9). As a result, there was active infection and significant inflammation. (*Id.* at 10). Dr. Powell illustrated the tunneling that he saw during surgery by drawing on an anatomical figure, and he testified that the dysfunctional colostomy was creating fistulas from the site of the stoma. The fistula tunnels that developed below skin level had been allowing pus, fluid, and bacteria to communicate between the ostomy site and the midline wound. (*See id.* at 11-13; PX 32). Dr. Powell described the tunneling communication as a colocutaneous fistula resulting from the retracted stoma, which caused necrosis, persistent infection of the abdominal wall and skin, muscle, and fatty layers, and significant scarring of the ostomy site. (PX 56 at 13-14).

Dr. Powell had to resect a small portion of Ms. Turner's colon, which encompassed the colostomy that was inflamed and scarred, and he then took the remainder of that end of the colon and reconnected it to her rectum. (*Id.* at 17-18). Because there was such a risk of leakage and infection from the reconnected colon tissue, Dr. Powell created what he intended would be a temporary ileostomy from small bowel tissue, forming a loop ileostomy on the other side of Ms. Turner's abdomen. (*Id.* at 17, 19-20; *see also* PX 31).

During the December 13 surgery, Dr. Powell made an incision to search for the foreign body, which was wound packing material, and he surgically removed it. He opined that the presence of the foreign material was likely contributing to Ms. Turner's continuing infection. (*Id.* at 15-16). He described the follow up surgeries that were performed to debride Ms. Turner's wound and a follow up surgery to clean out the scar tissue and abscess created by the infection

resulting from her retracted stoma. (*Id.* at 22-26; *see also* PX 33 [describing additional necessary surgical procedures]; *see also* PX 43-46, 58). Ms. Turner was released from Saint Francis on January 6, 2013. (PX 33).

Ms. Turner's condition required ongoing wound care, and she continued to suffer from abdominal pain and dehydration, which resulted in acute kidney injuries. (Doc. 86 at 117). During the four years following her surgery, Ms. Turner was treated regularly by her family physician, Meagan Brady, M.D. at the Koweta Indian Clinic, and she received treatment from pain management specialists. (*See* PX 59, 60). Her ileostomy, which had been created by Dr. Powell in order to correct the retracted colostomy stoma, was finally taken down on August 1, 2016, restoring bowel function. (*Id.*).

Dr. Femi-Pearse testified that, during the time Ms. Turner was under his care, he never suspected a retracted stoma, did not discuss that possibility with Ms. Turner, and did not offer her any surgical option to revise the stoma. (PX 55 at 76, 116, 135-136). He further acknowledged that there is no documentation reflecting that, before the surgery, he ever marked a location for the stoma, as is necessary to ensure appropriate placement based upon a person's unique physical characteristics. (*See id.* at 45-46; *see also* PX 42, pp. CIH 577-578 [no mention of skin marking for stoma placement]).

Ms. Turner testified that she was not marked for stoma placement before the surgery. (Doc. 87 at 215-216). Ms. Turner described for the Court the pain she endured during and after her stay at the Claremore Indian Hospital. Her stoma from the original surgery never functioned properly, constantly leaked and caused her pain, and she repeatedly questioned the Hospital doctors and nursing staff as to the availability of options to correct the problems she was experiencing. During the several weeks that she was under the Hospital's care, she was instructed to walk more and eat

more protein, but she was not offered any solution to the dysfunctional stoma that was causing her pain, leakage, and infection. (*Id.* at 219-239).

Ms. Turner further described the pain, humiliation, embarrassment, and emotional suffering that she endured as a result of the retracted stoma and resulting complications over the course of four years. Those included additional surgeries and a second ostomy to correct the original colostomy and ultimately eliminate the infection that was not properly treated at the Hospital. (Doc. 87 at 246-264). She developed a hernia above the colostomy sight. (*Id.* at 253). She displayed to the Court her abdomen to show the significant disfigurement from her multiple surgeries to correct the colostomy and rid her body of the resulting infection. (*Id.* at 264). Ms. Turner experienced pain when she ate, and she had a limited ability to stand, walk, or lift anything over four pounds. (DX 51).

Plaintiff's expert, Dr. Ault, is a Board Certified General Surgeon and Board Certified Colorectal Surgeon. Dr. Ault testified as to his opinion that the Hospital's care and treatment of Ms. Turner breached the standard of care and resulted in long-term injuries to her. (Doc. 86 at 38). He testified that the Hospital failed to recognize and diagnose the retraction of her stoma from the surgery performed by Dr. Femi-Pearse and ignored numerous early signs of infection. (*Id.*). These failures led to the chronic abdominal wound that she had and the problems and difficulties that were experienced over a period of greater than six weeks of trying to care for this wound and this colostomy, which ultimately led to the surgery at Saint Francis and the findings of Dr. Powell at the time of his surgery. (*Id.*). The breach of standard of care at the Claremore Indian Hospital resulted in "the requirement for the revision of the colostomy [and] the subsequent multiple operative debridements," which ultimately led to complications of acute kidney injury. (*See id.* at 38-39).

According to Dr. Ault, the Hospital should have recognized there was a wound infection by November 5, 2012, where the Hospital's records indicated that there was dark grumous fluid and cheesy liquid evacuated from Ms. Turner's midline incision. (*Id.* at 47). With respect to the November 5, 2012 CT scan (PX 39), Dr. Ault testified that pockets of air were visible outside of the colon wall and there was fat stranding, which indicated the beginning of a problem. (Doc. 86 at 52). The CT scan also revealed a concavity of the colostomy, which would make it "very hard to get an appliance to fit on there properly due to that kind of divot of the skin at that point." (*Id.*). Dr. Ault also noted that the CT scan indicated there was "already some stool and stuff here on the outside of this image," which would have been of concern. (*Id.*). In Dr. Ault's opinion, the November 5, 2012 laboratory results showing the presence of Enterococcus Faecalis in Ms. Turner's midline wound would require a physician exercising ordinary care to (1) carefully inspect the stoma to determine whether it was causing the wound infection and (2) surgically open the wound to allow the infection to drain. (*Id.* at 56-57).

Dr. Ault further faulted Dr. Femi-Pearse for failing to diagnose or take further steps to determine whether the stoma had retracted after he observed on November 14, 2012 that the stoma had changed to oblong, which is a sign of stoma retraction. (*Id.* at 60-61). When Ms. Turner returned to the Hospital the following day, November 15, the stoma had become "slit-like," which was a further warning sign that the stoma had retracted. (*Id.* at 62). The entire time that Ms. Turner was seen post-op at the Hospital, she complained of ill-fitting colostomy bags, which Dr. Ault indicated was an additional sign that stool may be leaking into the wound, signaling that the stoma may be causing the ongoing problems. (*See id.* at 62-63). Dr. Ault indicated that the Hospital should have been determining the source of the brown stool exiting the infra-umbilical wound. (*Id.*).

According to Dr. Ault, the CT scan taken on November 16, 2012 showed further signs of persistent infection and problems with the stoma itself. (*Id.* at 64). Dr. Ault further opined that Ms. Turner's infection would not have resolved without treating the cause of the infection, which was the dysfunctional stoma and related leaking and communication between the bowel and the wound. (*See id.* at 71-72). There were numerous signs of stoma retraction and resulting infection during Ms. Turner's Hospital stay from November 15 through December 4, 2012, but the Hospital did not properly diagnose or treat Ms. Turner's condition. (*Id.* at 103-105). Ms. Turner was again discharged from the Hospital without any confirmed diagnosis of the infection or its cause, and her retracted stoma was not diagnosed or treated. (*Id.* at 101-102; *see* PX 23, 24). Dr. Ault was further troubled by the fact that the CT scan at Saint Francis showed packing material that had been covered by granulated tissue, while the Claremore Indian Hospital had previously released Ms. Turner despite her report of abdominal pain above the wound vac dressing and her feeling that something was "stuck there." (Doc. 86 at 97). Dr. Ault found this significant, because she was reporting that "something is wrong in the wound," but the Hospital apparently did nothing before releasing her again. (*Id.*).

Dr. Robert Skib, the plaintiff's expert radiologist, testified that the CT scan of November 5 showed evidence that the ostomy was retracted down to the level of the anterior abdominal wall, which was causing fecal material to be released directly into the abdominal wall, resulting in a serious infection. (Doc. 86 at 162-167). Dr. Skib further opined that the scan of November 16, 2012 showed that the midline wound was "significantly worse than on the prior study." (*Id.* at 171). Dr. Skib explained and showed on the CT the area where the bowel should have connected to the skin but instead showed nothing or showed the development of stranding and infection inconsistent with the appearance of normal bowel. (*See* Doc. 86 at 161-184).

Dr. Nina Jones, a diagnostic radiologist who prepared a report of the November 5, 2012 CT scan and who assisted Dr. Femi-Pearse in conducting a fistulagram, testified for the defendant. She testified that the scan showed "the loop of bowel as it enter[ed] into the muscle wall," and "bowel coming and extending along the skin margin." (Doc. 87 at 283). However, she acknowledged that the bowel wall and its margins were "poorly seen" because the scan was completed without contrast. (*Id.* at 284). Dr. Jones had no recollection of any of the following: caring for Ms. Turner; whether a wound vac was in place during the fistulagram she assisted; whether Ms. Turner had an infection in the midline wound; or whether she saw Ms. Turner's ostomy on the day of the fistulagram or CT scan. (*Id.* at 284, 287-288). She also had no recollection of viewing Ms. Turner's incision site or abdomen. (*Id.* at 290). Her testimony was based only upon information in her written report. (*See id.* at 285-287). Based upon her report, she acknowledged that the fistulagram did not determine whether the midline wound was communicating with the ostomy site. (*Id.* at 294). The Court did not consider her testimony to be of much assistance in determining the facts in issue.

Another diagnostic radiologist, Dr. Hooby Yoon, testified that he prepared the report of the November 16, 2012 CT scan of Ms. Turner's abdomen and pelvis. Based on his report, he testified that "there was nothing remarkable to describe, aside from [a left lower quadrant colostomy] being present." (Doc. 87 at 302). He testified that the colostomy appeared to "extend to the surface of the skin." (*Id.* at 304). Dr. Yoon did not note that there was an infection of the midline wound, but he noted there "was a defect and some stranding and some air and those sort of findings," which he recorded as "scattered stranding and subcutaneous air [which was] seen throughout the anterior abdominal wall." (*Id.* at 307; *see* DX 12 at 2). Dr. Yoon did not have a full clinical history

of Ms. Turner and was thus unaware that there had been evidence of fecal material in the midline wound.  (Doc. 87 at 309).

The defendant's expert on colon and rectal surgery, Dr. Craig Johnson, M.D., opined that the Hospital and its medical providers met the standard of care in their treatment of Turner in October, November, and December of 2012.  (Doc. 87 at 313-314).  Dr. Johnson reviewed the CT scan of November 16, 2012, and he believed that the ostomy came up to the level of the skin.  (*Id.* at 335-336).  With respect to the November 16, 2012 scan, defense counsel asked, "what is the chance that the stoma had retracted and the stool and barium are passing simply through the tract where the stoma used to be?"  Dr. Johnson replied, "I'd say that it probably couldn't do that at this point because now we're over two weeks after surgery."  (*Id.* at 336).  He acknowledged, however, that it appeared that, on or between November 15 and December 4, 2012, the colostomy had become flush with the skin, which can lead to ostomy leakage.  (*Id.* at 319).

Dr. Johnson opined that, as of November 16, 2012, the stoma was "right at the skin level." (*Id.* at 337).  However, on cross-examination, he admitted that he had prepared a written report that noted "some skin changes of the ostomy at the skin level were noted which is evidence of mild ostomy retraction."  (*Id.* at 343).  He also acknowledged that, contrary to his written opinion that "there was no clinical problem other than mild retraction causing a bothersome ostomy leakage," in reality the ostomy leakage "was documented to be contaminating her midline wound with fecal material . . . on occasion," and the midline wound was expressing pus.  (*Id.* at 344).  He also had not seen Dr. Powell's diagram, which reflected the tunneling and fistula tracts he saw between the ostomy site and the midline wound when he performed the surgery at Saint Francis.  (*Id.* at 346).

The defendant also presented the testimony of Jack Mocnik, Jr., M.D., a retired radiologist. He acknowledged that the CT scan taken at Saint Francis on December 12, 2012 showed that the

stoma had become disconnected and retracted. (Doc. 88 at 398-399). Dr. Mocnik opined that the November 5, 2012 CT scan showed that the colon limb to the stoma was intact, such that there was continuous flow of the fecal stream to the ostomy site, with no identifiable leakage. (*Id.* at 386). With respect to the CT scan of November 16, Dr. Mocnik testified as to his opinion that the ostomy was working. (*Id.* at 396-397). However, Dr. Mocnik had not reviewed the pathology culture reports from the same timeframe (*id.* at 404), and he acknowledged on cross-examination that he would expect pus to be expelled from the ostomy if fecal material had been accumulating because of a problematic ostomy (*see id.* at 406-407). Hospital records on November 15 reflected that the ostomy *was* leaking drainage that looked like the pus that had been expressed from the upper midline wound. (PX 42 at CIH 249). The Court does not find Dr. Mocnik's testimony to be particularly helpful, in light of the fact that he did not take into account other relevant medical records.

The defendant called several Hospital nurses as witnesses to support the defendant's claim that there were no serious problems with Ms. Turner's colostomy or wound care. Steven Brown, a Registered Nurse who had worked at the Hospital during the time between October and December 2012, testified that he recalled caring for Ms. Turner and, had he noted any abnormal findings with respect to her ostomy, he would have recorded such findings. (Doc. 87 at 356-357). He made medical notes of the ostomy on October 27, October 28, November 21, December 1, December 2, 2012, and noted that she had an ostomy and did not note any abnormal findings. (*Id.* at 357-358, 363-364). On November 21, 2012, he noted that the colostomy bag and wafer were changed and recorded that the "skin looks good with very little breakdown. Area around the stoma pink, but healing well. The seal looked good, and to continue to monitor the colostomy." (*Id.* at 360; *see* DX 10 at CIH290).

Nurse Brown testified that he recalled that, at all times he was caring for her, Ms. Turner's stoma was "at or above skin level." (Doc. 87 at 360). However, he did not remove the bag each time he saw Ms. Turner, except when he changed it. (*Id.* at 367). He saw brownish material from the wound, and acknowledged that it was possible that it could have been fecal contamination. (*Id.* at 368-369). He acknowledged that, as a nurse caring for a patient, he would need to review other medical notes regarding the patient, but he had reviewed only the limited records selected by defense counsel for his review before his trial testimony. (*Id.* at 370). Nurse Brown also testified that he did not recall the medical notes indicating that Ms. Turner's stoma was oblong or like a slit, or that pus was going from the ostomy to the midline wound. (*Id.*). Brown recalled that there was difficulty obtaining a seal on Ms. Turner's stoma. (*Id*. at 371). He also recalled observing Ms. Turner nauseated and vomiting, and in extreme pain. (*Id.* at 373).

Another defense witness, Registered Nurse Cindy O'Mary, testified that she was the Hospital's nurse manager during the time that Ms. Turner was under the Hospital's care. (Doc. 88 at 412). According to Nurse O'Mary, at all times that she cared for Ms. Turner, her stoma was "intact" and was "at or above the skin level." (*Id.* at 414). On cross-examination, O'Mary described the stoma as "flush." (*Id.* at 443). She was present during a colostomy bag change on November 14, 2012 and did not observe anything abnormal about the stoma or she would have recorded it, in accordance with the Hospital's practice of "charting by exception." (*Id.* at 415, 418).

During the time that O'Mary assisted in Ms. Turner's care, there were problems sealing the colostomy bag onto her skin, which resulted in leakage. (*Id.* at 436-437). O'Mary changed the ostomy bag and used a larger wafer because the smaller wafer was not as effective, and the ostomy still leaked. (*Id.* at 437). She also acknowledged that, throughout her stay at the Hospital,

Ms. Turner regularly had pain and experienced nausea. (*Id.* at 439, 443). She also recalled that Dr. Femi-Pearse had noted a change in the shape of the stoma – that it was more oblong than oval. (*Id.* at 443). Nurse O'Mary acknowledged that she completed a wound vac therapy insurance authorization form in which she noted "tunneling / sinus" of Ms. Turner's upper wound that was 6 centimeters deep. (*Id.* at 448-449; *see* PX 42 at CIH400). The form indicated that the measurement was taken on November 26, 2012. (PX 42 at CIH400). O'Mary further testified that Ms. Turner was admitted to the Hospital on November 15 because of infection in the midline wound, which required antibiotics (*id.* at 451-452), but the wound vac was not placed for six days because it was a charity vac. (*Id.* at 452).[2] Nurse O'Mary testified that, "when a patient has a newly formed ostomy, it's important for health care providers to monitor carefully to be certain that infection is not coming from an abdominal source where all this bowel work was done." (*Id.*). She was unable to recall or explain what had been done to meet that standard. (*See id.*).

Another Hospital nurse, Linda Edens, testified that she provided care to Ms. Turner on October 17, 18, 19, November 15, 16, 17, 18, 19, 26, and 27, 2012, but she did not have any recollection of Ms. Turner at the time she testified. (Doc. 88 at 469-470). She claimed that she would have noted if she had observed any abnormality with respect to her care of Ms. Turner. (*Id.* at 471-472). Nurse Edens did not have a memory of observing Ms. Turner or reviewing medical notes of other Hospital health care providers that indicated Ms. Turner's ostomy was leaking, that she was in pain, constipated, nauseous, or vomiting, or that her midline wound was contaminated with fecal material. (*Id.* at 479).

---

[2] However, Nurse O'Mary later acknowledged that the Hospital had a vac that it could have used. The Hospital's vac was ultimately placed on Ms. Turner's wound on November 21, and that vac was a different one from the charity vac that was subsequently sent home with Ms. Turner on December 4, 2012. (Doc. 88 at 460).

Edwina Berryhill, another Hospital nurse, testified that she cared for Ms. Turner in the fall of 2012, but she had no recollection of Ms. Turner. (Doc. 88 at 483). Nurse Berryhill indicated that her notes from the Hospital did not refresh her recollection as to her care of Ms. Turner. (*Id.* at 486-487). Cheri Fleming, Registered Nurse, cared for Ms. Turner at the Hospital. Fleming testified that she did not have a present recollection of Ms. Turner, but she claimed to recall that Turner did not have any problems with her ostomy. (*Id.* at 490). Another nurse, Danna Roberts, testified that she had no recollection of observing Ms. Turner's stoma during 2012, but then indicated that she did and the stoma "was normal to me" and she remembered "it looking normal." (*Id.* at 492). On cross-examination, she made it clear that she was only testifying from notes.

Upon viewing the witnesses on the witness stand, their demeanor, the manner of their questioning and testimony, and the evidence upon which the witnesses testified, the Court finds that the plaintiff's witnesses were credible and established by a preponderance of the evidence that the Hospital breached the standard of ordinary care owed to Ms. Turner. Ms. Turner herself was very credible and forthright. Dr. Ault's testimony was helpful and properly based upon his expertise, experience, and education. His opinions were consistent with medical records in the case, Dr. VanZandt's findings upon Ms. Turner's admission to the Saint Francis emergency room, the Saint Francis CT scan, and Dr. Powell's surgical findings. The Court credits Dr. Ault's expert testimony that the Claremore Indian Hospital's care of Ms. Turner breached the applicable standard of care and resulted in long-term injuries to her.

Based upon the evidence, the Court finds that the Hospital failed to properly and timely detect and treat the failing and retracting stoma, the worsening infection of the midline wound, and the packing material that was left in Ms. Turner's wound. Those failures proximately caused Ms. Turner extended, significant pain and mental anguish, lasting injuries and disfigurement, and

resulted in the necessity for corrective surgery, including takedown of the failed colostomy and a surgery to the other side of the abdomen to perform an ileostomy. Because of the Hospital's medical negligence, Ms. Turner had to wear an ostomy bag for more than three years longer than had been expected at the time of her colostomy surgery. She further suffered economic damages, as discussed below.

### *Damages*

#### 1.     *Economic Damages*

Prior to the colostomy surgery at the Claremore Indian Hospital, Ms. Turner worked as a customer service manager for Walmart, where she earned $12.75 hourly. At times, she was compensated for overtime. (Doc. 87 at 211). Her tax returns for the three years before her colostomy surgery reflect that she had income of $25,217 (2010), $26,997 (2011), and $24,937 (2012). (*Id.* at 210-211; PX 51). Ms. Turner requests that the Court award her $200,000 for past and future wages, based upon a likely retirement age of 65. (*See* Doc. 89 at 17). At the time of trial, Ms. Turner was 59 years old and had been unable to work for four years because of her medical complications. However, the evidence did not establish that she would not be able to work at all until the age of 65. Based upon the evidence presented at trial, the Court finds that Ms. Turner should be awarded five years of lost wages that were proximately caused by the defendant's medical negligence. Her annual wages for the three years prior to her surgery and complications at the Hospital averaged approximately $26,000. Accordingly, the Court finds that she should be awarded a total of **$130,000** for five years of lost wages.

Ms. Turner asserts that she incurred medical bills in the amount of $153,364.34 because of complications from her retracted stoma and resulting infection. (Doc. 89 at 17; *see* PX 49 at 11). At trial, the defendant objected to the inclusion of "about $6,000 or $7,000" in medical bills, which

the defendant argued were not due or owing and should not have been included under *Okla. Stat.* tit. 12, § 3009.1. (Doc. 87 at 61). The government also objected to the inclusion of medical bills of Advanced Pain Specialists from 2015 and 2016 and Gastroenterology Specialists in 2016, based on an argument that those billings were not related to Ms. Turner's complications from the ostomy, infected wound, and resulting problems. The Court has reviewed those billings. The Advanced Pain Specialists billings appear related to celiac plexus injections and related pain control for abdominal pain, such that those billings appear reasonably related to Ms. Turner's complications. Ms. Turner generally testified that her medical billings were for conditions that resulted from the ostomy and infection complications (*see* Doc. 87 at 254).

The Court finds that the billings of Gastroenterology Specialists and Advanced Pain Specialists appear related to Ms. Turner's ongoing problems that are at issue in this case, such that she will be awarded the amount of those billings paid and/or owing. However, the Court will not award the amounts sought for medical billings of Saint Francis Imaging in May 2015 (*see* PX 49 at 10), as those billings, which were for procedures with respect to Ms. Turner's hand and arm, are unrelated to the issues in this case. (*See* PX 50).

Each side submitted medical billing summaries and affidavits which they believe reflect the amounts of medical billings that are admissible under § 3009.1. (PX 49; DX 55). Many of the numbers for provider billings are identical on PX 49 and DX 55. However, for some providers, one or the other of the parties provided more current or more complete information. In those instances, the Court has utilized the totals that more accurately reflect the medical billings paid and/or owing. Comparing the medical billings, affidavits, and the parties' conflicting charts, the Court finds that the following amounts are admissible and should be awarded to Ms. Turner for

medical bills admissible under § 3009.1 and which were for medical care that was required as a result of the defendant's negligence:

| | |
|---|---|
| Advanced Pain Specialists of Tulsa | $5643.39 |
| All Saints Home Medical | $1887.20 |
| Amedisys | $503.79 |
| Associated Anesthesiologists, Inc. | $4480.92 |
| Coram, Inc. | $281.13 |
| EMP of Tulsa County, PLLC | $644.17 |
| EMSA | $1369.60 |
| Gastroenterology Specialists, Inc. | $2271.41 |
| Lab Medicine of Greater Tulsa | $175.00 |
| Muscogee Creek Nation / Koweta Indian Clinic | $0.00 |
| Radiology Consultants | $3179.91 |
| Regional Medical Laboratory | $402.82 |
| Saint Francis Health System | $108,343.17 |
| Saint Francis Imaging | $0.00 |
| Warren Clinic, Inc. | $9708.13 |
| | |
| **Total Medical Bills Paid and/or Owing** | **$138,890.64** |

> 2.     *Noneconomic Damages*

The Court finds that Ms. Turner should be awarded the statutory maximum of **$350,000.00** for noneconomic damages, which include Ms. Turner's past and future physical and mental pain, suffering, and disfigurement proximately caused by the defendant's medical negligence. *Okla. Stat.* tit. 23, § 61.2.  While the Court finds that the defendant and its medical providers were negligent and caused Ms. Turner significant pain and suffering and other damages, the Court does not find that there was clear and convincing evidence of gross negligence or reckless disregard, such as would support lifting the noneconomic damages cap. *See id.*

## II.     Conclusions of Law

### *Jurisdiction, Venue, and Administrative Exhaustion*

The Court has jurisdiction of the parties and subject matter to hear and determine liability

and damages pursuant to 28 U.S.C. §§ 1346(b).  Venue properly lies in this District pursuant to 28

U.S.C. § 1402(b).  Plaintiff exhausted her administrative remedies and timely filed this action

under 28 U.S.C. § 2675.

### *Medical Negligence*

"[T]o establish governmental liability under the FTCA, a plaintiff must establish that the

injury at issue was 'caused by the negligent or wrongful act or omission of any employee of the

Government . . . under circumstances where the United States, if a private person, would be liable

to the claimant in accordance with the law of the place where the act or omission occurred.'"

*Gallardo v. United States*, 752 F.3d 865, 870 (10th Cir. 2014) (quoting *Harvey v. United States*,

685 F.3d 939, 947 (10th Cir. 2012)).  Accordingly, "the FTCA mandates application of" Oklahoma

law "to resolve questions of substantive liability."  *Id.*

Under Oklahoma law, a "medical malpractice claim, like all negligence claims, contains

three elements: (1) a duty owed by the defendant to protect the plaintiff from injury, (2) a failure

to properly exercise or perform that duty and (3) plaintiff's injuries proximately caused by the

defendant's failure to exercise the required duty of care."  *Nelson v. Enid Med. Associates, Inc.*,

376 P.3d 212, 216 (Okla. 2016); *see also Robinson v. Oklahoma Nephrology Associates, Inc.*, 154

P.3d 1250, 1253-54 (Okla. 2007).  In diagnosing the condition of, or in treating or operating upon

a patient, a physician must use his or her best judgment and apply with ordinary care and diligence

the knowledge and skill that is possessed and used by members of his or her profession in the same

field of practice. OUJI Civil No. 14.1. "A physician does not guarantee a cure and is not

responsible for the lack of success, unless that lack results from [the physician's] failure to exercise ordinary care or from [his or her] lack of that degree of knowledge and skill possessed by physicians in the same field of practice." *Id.*

"[A] hospital has an implied duty to exercise ordinary care and attention in proportion to the physical condition of the patient." *Weldon v. Seminole Mun. Hosp.*, 709 P.2d 1058, 1061 (Okla. 1985); *see also* OUJI – Civil No. 14.15 ("A hospital must exercise ordinary care and attention for its patients. Ordinary care means that care and attention required under all the circumstances that is appropriate to the physical and mental condition of each patient."). A hospital may be subject to respondeat superior liability for negligent acts of its healthcare providers where the patient at the time of admittance looks to the hospital for treatment of his or her physical ailments with no belief that the physicians were acting on their own behalf rather than as agents of the hospital. *Roth v. Mercy Health Center, Inc.*, 246 P.3d 1079, 1089-90 (Okla. 2011). In this case, the acts and omissions of the Hospital's health care providers are attributable to the Hospital.

To establish causation, a plaintiff must produce evidence that establishes a causal link between the negligence and her injuries and must persuade the trier of fact by a preponderance of the evidence that her injuries were caused by the negligence. *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467, 471 (Okla. 1987). "A defendant whose conduct contributed to cause a plaintiff's injury is liable for the injury even if his conduct was not sufficient by itself to cause the injury." *Robinson*, 154 P.3d at 1254. "While the plaintiff must present evidence to remove the cause of her injuries from the realm of guesswork, she need not establish causation to a specifically high level of probability. . . ." *Id.* at 1254 (citing *Neese v. Shawnee Med. Ctr. Hosp., Inc.,* 626 P.2d 1327, 1331 (Okla. 1981). "'Absolute certainty is not required.'" *Id.* (quoting *McKellips,* 741 P.2d at 471). "A patient's recovery should not be denied when there has been an 'irrefutable loss

suffered by reason of conduct which breaches the duty imposed to prevent the very type of harm the plaintiff ultimately sustains." *Id.* at 1255 (quoting *Hardy v. Southwestern Bell Tele. Co.*, 910 P.2d 1024, 1028 (Okla. 1996)). While the testimony of an expert witness is often required to establish causation, Oklahoma law does not require that an expert use any "magic words" to support causation. *See Jones v. Mercy Health Center, Inc.*, 155 P.3d 9, 15 (Okla. 2006).

Applying the applicable legal standards to the evidence, the Court concludes that, in undertaking the care of Ms. Turner, the healthcare providers at Claremore Indian Hospital owed Ms. Turner a duty of ordinary care that met the applicable standards of care for her condition. Ms. Turner established by a preponderance of the evidence that Dr. Femi-Pearse and other healthcare providers at the Hospital breached their duties to exercise with ordinary care and diligence the knowledge and skill that is possessed and used by members in the same fields of medical practice. The Court further concludes that Ms. Turner suffered injuries that were proximately caused by the defendant's failure to exercise the required duty of care, and she is entitled to recover damages that will compensate her for injuries proximately caused thereby. *Okla. Stat.* tit. 23, § 61.

### *Damages*

Under Oklahoma law, the measure of damages in personal injury actions "is the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not." *Okla. Stat.* tit. 23, § 61. In a civil action arising from a claimed bodily injury, damages for economic loss are not limited. *Okla. Stat.* tit. 23, § 61.2. Noneconomic damages are limited to $350,000 in the absence of clear and convincing evidence of gross negligence or reckless disregard for the rights of others. *Id.*

In addition to the cap on noneconomic damages, the defendant argues that, pursuant to *Okla. Stat.* tit. 12, § 3009.1 (2011), the plaintiff cannot recover the full amount she seeks for

medical bills. Section 3009.1 "serves to limit certain types of evidence admissible by parties in the trial of any civil case involving personal injury." *Lee v. Bueno*, 381 P.3d 736, 741 (Okla., 2016). The Oklahoma Supreme Court explained the effect of the statute as follows:

> [The statute] limits all parties in a personal injury action to admitting evidence of the amount paid for medical services, rather than the amount billed. . . . [T]he statute as a whole operates to ensure [that personal injury plaintiffs] are permitted only to admit into evidence the amounts actually paid or owed for medical services . . . [and to prevent] a party from admitting into evidence amounts they did not have to pay and thus obtaining a potentially greater amount in damages for medical services than the amount actually paid or owed.

*Id.* at 743-46. The Oklahoma Supreme Court noted that § 3009.1 "is in accord with the collateral source rule because it does not prevent admission into evidence of the amount actually paid or owed for medical care, regardless of whether the amount was paid by the injured party or by some other entity on the party's behalf, such as an insurer." *Id.* at 750.

The Court's findings with respect to damages (*see supra* at pp. 19-21) are consistent with the foregoing Oklahoma law regarding economic and noneconomic damages in bodily injury cases and the statute governing the admissibility of (and recovery for) medical billings. *See Okla. Stat.* tit. 23, §§ 61, 61.2; *Okla. Stat.* tit. 12, § 3009.1.

## III. Conclusion

Based on the foregoing findings and conclusions, the plaintiff, Marian Turner, is entitled to a Judgment in her favor and against the defendant, United States of America, in the total amount of **$618,890.64**, consisting of $130,000 in lost wages, $138,890.64 in medical expenses, and $350,000 for past and future physical and mental pain, suffering, and disfigurement.

SO ORDERED this 1st day of March, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE